**Lynwood M. GUY d/b/a Lynwood M. Guy Farms, Plaintiff,**

v.

**Dan GLICKMAN, Secretary, United States Department of Agriculture, Defendant.**

**Civil Action No. 95–1948 (JHG).**

United States District Court, District of Columbia.

Nov. 15, 1996.

Alexander John Pires, Jr., Conlon, Frantz, Phelan & Pires, Washington, DC, for plaintiff.

Stefania M. Porcelli, U.S. Attorney's Office, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently pending are the parties' cross-motions for summary judgment. The plaintiff, Lynwood M. Guy ("Guy"), has filed suit against the Secretary of Agriculture ("Secretary") contending that defendant's final administrative decisions on April 10, 1994, (for crop year 1993) and June 1, 1995, (for crop year 1994) were arbitrary and capricious and not in accordance with law. For the reasons expressed below, plaintiff's motion will be denied, defendant's motion will also be denied, and this matter will be remanded to the Secretary for further action consistent with this Opinion.[1]

---

1. Pursuant to Rule 108(f) of the Rules of the United States District Court for the District of Columbia, this Court has determined that oral argument is not necessary or appropriate in this case. Therefore, Plaintiff's Request for Oral Argument on Plaintiff's Motion for Summary Judgment is denied.

## I. BACKGROUND

This case involves a dispute between a plaintiff farmer and the Department of Agriculture ("Department") over the amount owed to plaintiff under the Department's Disaster Payment Program. The material facts in this case are not disputed.[2] As a farm operator in Northampton County, Virginia, Lynwood M. Guy grows a variety of crops. In 1993, Virginia suffered from drought and excessive heat, which qualified as eligible disaster conditions under applicable Department of Agriculture regulations. These conditions resulted in a low basil yield for Guy and he therefore applied to his county committee for disaster program benefits.[3]

To calculate Guy's disaster payment, the county committee applied the 1993 Disaster Rates and Yields for Non–Program Crops listed in Virginia notice PAD–166. Using the established yield of 49,719 bunches with a loss of 60% (or 29,831 bunches) multiplied by a payment rate of $5.85[4] per bunch, the county committee determined that Guy was due $174,511 for his basil disaster losses. Approximately two weeks later, the state committee approved a revised yield and payment rate for basil. Using the revised yield of 15,000 bunches with a loss of 60% (or 9,000 bunches) multiplied by a payment rate of $0.43 per bunch, the county committee calculated that Guy was actually due a disaster payment of only $3,861 for his basil losses. Guy received a check for $3,861.[5]

Virginia also suffered from eligible disaster conditions (again, drought and excessive heat) in 1994. Among other crops,[6] Guy applied for disaster payments due to low arugula yields. Using the applicable state yield and payment rate for arugula, the county committee calculated Guy's disaster payment as 96,000 bunches per acre multiplied by Guy's 1.5 acres multiplied by $0.54 per bunch, or $77,760.

One month later, the state committee revised the rate and yield for arugula. Applying the revised figures to Guy's crop, the county committee determined that he was in fact due only $2,842.[7] Guy was paid $2,842.

Guy attempted to appeal the revision of the arugula numbers. The state committee denied his appeal on the grounds that he had no right to reconsideration or review of general program requirements that were applicable to all program participants. Guy then filed the instant action.

In this action, Guy contends that Secretary's reduction of his Disaster Payment Program benefits was not authorized by statute or regulation and was therefore arbitrary, capricious, and unlawful. *See* Complaint ¶ 16 (Count II). He seeks a declaratory judgment that he should receive disaster benefits as originally calculated. *Id.* at ¶ 14 (Count I). Count III, which Guy voluntarily dismissed, alleged breach of contract. *Id.* at ¶ 19. Finally, Guy claims that his due process rights were violated when he was refused a hearing to discuss the changed rates and yields. *Id.* at ¶ 22 (Count IV).

## II. DISCUSSION

### A. The Standards of Review

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the thresh-

---

2. The facts herein are compiled from Defendant's Statements of Material Facts Not in Dispute and Plaintiff's Statement of Material Facts As To Which There Is No Genuine Issue.

3. Guy also submitted applications for disaster payments for several of his other low-yielding crops, including leeks, snapbeans, and zucchini. Administrative Record at 90. However, his disaster payments for these crops are not in dispute.

4. $5.85 represents 65 percent of the $9.00 rate established in Virginia notice PAD–166.

5. Neither party notes that $9,000 \times \$0.43 = \$3870$, not $3861.

6. Again, his disaster payments for these other crops are not in dispute.

7. According to the administrative record, the revised yield for arugula was 15,672 bunches per acre and the revised payment rate was $0.31 per bunch. R. at 173. The Court recognizes that $(15,672 \times 1.5 \text{ acres} \times \$0.31)$ does not equal $2,842 and is confident that this discrepancy will be addressed on remand.

old inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that can properly be resolved only by a finder of fact .because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56(c) places a burden on the non-moving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ The Administrative Procedure Act (APA) empowers a reviewing court to overturn agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When a court is called upon to review an agency's construction of a statute that it administers, the court is confronted with two questions. The first inquiry is "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); *Chemical Mfrs. Ass'n v. U.S. E.P.A.,* 919 F.2d 158, 162 (D.C.Cir.1990). This determination involves examination of "the particular statutory language at issue, as well as the language and design of the statute as a whole." *K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988); *Chemical Mfrs. Ass'n,* 919 F.2d at 162. If congressional intent is clear, it must be given effect. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *Chemical Mfrs. Ass'n,* 919 F.2d at 162. However, if the statute is silent or ambiguous on a particular issue, the court "must defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose." *Chemical Mfrs.*

*Ass'n,* 919 F.2d at 162–63; *see Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83.

■ The arbitrary and capricious standard of review is a highly deferential one, *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), which presumes the agency's action to be valid. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir. 1981). The burden of overcoming this presumption rests on the party challenging the agency action. *Mt. Airy Refining Co. v. Schlesinger,* 481 F.Supp. 257, 264 (D.D.C. 1979), *citing Udall v. Washington, Va & Md Coach Co.,* 398 F.2d 765 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). The Supreme Court has stressed that the scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24. So long as the agency's decision "was based on a consideration of the relevant factors," *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824, the reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *reh'g denied* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975), even though the court might otherwise disagree, *United States v. Allegheny–Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946–47, 32 L.Ed.2d 453 (1972).

■ On the other hand, a court reviewing agency action under the arbitrary and capricious standard should not simply rubber-stamp the administrative decision made. The court must assure that "the agency ... examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866, and may overturn a decision when the agency has "entirely failed

to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

 It is well settled that judicial review of agency action is generally restricted to the full administrative record before the agency at the time the decision was made. *Environmental Defense Fund,* 657 F.2d at 284. The focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825–26; *Doraiswamy v. Secretary of Labor,* 555 F.2d 832, 839–42 (D.C.Cir.1976). However, exceptions to this rule do exist. *See Asarco, Inc. v. U.S. E.P.A.,* 616 F.2d 1153, 1159 (9th Cir.1980). The most noted exception to the general rule occurs where "there was such a failure to explain administrative action as to frustrate effective judicial review." *Camp,* 411 U.S. at 142–43, 93 S.Ct. at 1244. When the record is inadequate, a court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Id.* at 143, 93 S.Ct. at 1244. However, these new materials should be merely explanatory of the original record and should contain no new rationalizations. *Bunker Hill Co. v. U.S. E.P.A.,* 572 F.2d 1286, 1292 (9th Cir. 1977). In fact, consideration of such new evidence to determine the correctness or wisdom of the agency's decision is not permitted, even when the court has also examined the administrative record. *Asarco,* 616 F.2d at 1160. If the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration and not compensate for the agency's dereliction by undertaking its own inquiry into the merits. *Camp,* 411 U.S. at 143, 93 S.Ct. at 1244; *Asarco,* 616 F.2d at 1159.

## B. The Statutory Scheme

Congress established the Disaster Payment Program to assist farm operators whose crops are adversely affected by catastrophic drought or other natural disasters. The Disaster Assistance Act of 1989 provided emergency crop loss assistance to producers of nonprogram crops [8] who suffered damaging weather in 1988 or 1989. Disaster Assistance Act of 1989, Pub.L. No. 101–82, § 104(a)(1)(A), 103 Stat. 564, 570 (1989). The 1989 Act established the program's basic payment framework—an eligible producer could receive an assistance payment equal to 50 percent of the established yield for the particular crop multiplied by the producer's acreage of that crop multiplied by a crop-specific payment rate. *Id.* § 104(a). The 1989 Act also authorized the Secretary to issue regulations to implement the Disaster Payment Program. *Id.* § 155. The Department of Agriculture has codified regulations to implement this program at 7 C.F.R. § 1477 (1996).

The Food, Agriculture, Conservation, and Trade Act of 1990 extended the disaster assistance program to 1990 nonprogram crops. Pub.L. No. 101–624, § 2244, 104 Stat. 3359, 3967 (1990). The program continued in subsequent years under the same terms and conditions. *See* Supplemental Appropriations Act of 1993, Pub.L. 103–50, ch. 1, 107 Stat. 241, 241 (1993); Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, Pub.L. 104–37, tit. 1, 109 Stat. 299, 310 (1995).

Overall responsibility for the Disaster Payment Program rests with the Commodity Credit Corporation. *See* 15 U.S.C. § 714 (1994). The program is administered on the state and local levels by the state and county committee systems of the Department of Agriculture's Farm Services Agency. *See* 16 U.S.C. 590(h) (1994); 7 C.F.R. § 7.1 (1996); *Id.* § 1413.4; *Id.* § 1477.2. (Prior to the USDA Reorganization Act of 1994, the Farm

---

8. Nonprogram crops are those that are produced for sale or exchange on a commercial basis, but that are not covered by crop-specific Department of Agriculture target prices or quotas. 7 C.F.R. § 1477.3 (1995). Basil and arugula are nonprogram crops.

Services Agency was known as the Agricultural Stabilization and Conservation Service.) State committee members are appointed by the Secretary, 7 C.F.R. § 7.3; county committee members are elected by their farming peers in the local area, 7 C.F.R. §§ 7.4, 7.9.

### C. Did the Secretary Exceed His Statutory Authority?

 Plaintiff claims that the Secretary exceeded his statutory authority by modifying the payment rate and yield for basil in 1993 and for arugula in 1994. Therefore, plaintiff urges that the Secretary's action be reversed as "not in accordance with law," pursuant to 5 U.S.C. § 706(2)(A) (1996), and "in excess of statutory jurisdiction," pursuant to § 706(2)(C). However, plaintiff's theory ignores the fact that the power of an administrative agency to administer a congressionally created program necessarily requires policy formulation and rulemaking to fill gaps left implicitly or explicitly by Congress. Chevron, 467 U.S. at 843, 104 S.Ct. at 2781–82; Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072–73, 39 L.Ed.2d 270 (1974). Chevron provides the analytical framework for judicial review of agency implementation of statutes.

 The first step in a Chevron analysis is to determine whether Congress has directly spoken to the precise question at issue. Chevron, 467 U.S. at 843, 104 S.Ct. at 2781–82. In this case, Congress has not. In the 1990 Act, Congress established a hierarchy of data sources that the Secretary should consider in establishing yields. Food, Agriculture, Conservation, and Trade Act of 1990, Pub.L. No. 101–624, § 2244(d)(2), 104 Stat. 3359, 3969 (1990). Congress indicated how the payment rate should be calculated, id. § 2244(a)(1)(B), and directed the Secretary to establish payment rates on a crop-by-crop basis, id. § 2244(a)(3). Yet, Congress did not explicitly address whether the Secretary could, or under what circumstances the Sec-

retary should, modify established yield and rate numbers for a particular crop.

Because Congress has never spoken, throughout the history of this program, to the precise issue raised by plaintiff, the Court must now consider the second Chevron question: "whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. In this case, the overarching congressional design for the agricultural disaster relief scheme is clear: to provide, "not a windfall for any farmer, . . . but just enough to allow the farmer to meet his financial obligations within the community in the hopes that he can try again next year." 135 Cong.Rec. S10364–02 (daily ed. Aug. 4, 1989) (Statement of Sen. Pryor). This balance between fiscal conservatism and sufficient compensation permeates the entire statutory scheme. For example, payment rates are limited to 65 percent of the average price received by producers over the last five years. Food, Agriculture, Conservation, and Trade Act of 1990, Pub.L. No. 101–624, § 2244(a)(1)(B), 104 Stat. 3359, 3967 (1990) (soybeans, sunflowers, and other nonprogram crops); see also id. § 2242(a) (for nonparticipants in target price commodities programs, 65 percent of the basic county loan rate for the crop); id. § 2243(a) (65 percent of the applicable payment level for peanuts, tobacco, sugarcane, and sugar beets). In addition, the statutory scheme forbids overpayment by requiring that disaster assistance payments be reduced by the amount of any crop insurance recovery, id. § 2246; by prohibiting farmers from collecting for both an initial crop and a replacement crop, id. § 2243(a)(3)(C); and by prohibiting farmers from receiving both disaster payments for a feed crop and livestock emergency benefits for the same lost feed, id. § 2249(b). Finally, the total disaster payment any person may receive in one year is strictly limited to $100,000.[9]

---

**9.** Id. § 2249(a). Plaintiff seeks a declaratory judgment that he was entitled to full disaster relief benefits, specifically $174,511 for his 1993 basil crop and $77,760 for his 1994 arugula crop. Complaint at ¶¶ 8 & 9. Defendant counters that, "even assuming the defendant had no right to revise the original factors for basil and arugula,"

the applicable statute limits plaintiff's total payments for all crops under the Disaster Assistance Program to $100,000 per year. Although the Court need not reach this issue since the case will be remanded to the agency, the Court notes that the statutory language is clear and any re-

The Secretary's actions in this case were fully consistent with the goals of this statutory scheme. The underlying statutory purpose clearly required the Secretary to ensure that eligible farmers received disaster compensation, but did not collect windfalls or double payments. Therefore, when the initial calculations indicated that Guy might receive excessive disaster assistance payments—in fact the 1993 basil payment itself, as initially calculated, exceeded the $100,000 statutory limit on disaster payments to any one person for a given crop year—the Secretary acted reasonably in reviewing and revising the applicable yields and payment rates. To have done otherwise, and consequently to have awarded Guy a windfall, would have violated the purpose of the statutory scheme.

Plaintiff argues that defendant's own regulations prohibit modification of established rates and yields. Specifically, plaintiff cites 7 C.F.R. 1477.2(b) (1996):[10] "State and county FSA committees and representatives and employees thereof do not have the authority to modify or waive any of the provisions of this part as amended or supplemented." However, plaintiff's argument is unpersuasive because crop-specific rates and yields are not "provisions of this part," but are figures determined by State and/or local committees according to guidelines set forth in "this part." Section 1477.2(b) only prohibits State and county committees from altering the nationally applicable regulations, it does not address modification of rates and yields.

Accordingly, because the Secretary's modification of crop rate and yield figures in order to prevent a windfall payment was consistent with the statutory purpose and not contrary to any statutory or regulatory provision, plaintiff's motion for summary judgment on the claim that the Secretary exceeded his statutory authority or failed to act in accordance with law will be denied.

### D. Was the Secretary's Action Arbitrary and Capricious?

The ultimate dispute in this case is whether the agency acted arbitrarily and capriciously when it revised the basil yield and payment rate downward in 1993 and when it similarly decreased the arugula yield and payment rate in 1994. Unfortunately, the administrative record on both these points is so sparse as to frustrate effective judicial review.

With regard to the basil figures, the record shows that the 1993 basil yield was originally established at 16,573 bunches per acre with a payment rate of $9.00 per bunch. R. at 154. There is no information in the record to explain which factors the agency considered in establishing these figures. Next, while the record reveals that, "based on data from nine other states," the basil yield was revised to 5,000 bunches per acre with a payment rate of $0.66 per bunch, *see* R. at 164, there is no discussion in the record as to why the agency believed its original basil figures required revision. The data from each of the nine states are reproduced in the record, along with an average yield and payment rate calculated across all nine states. R. at 165. But, there is no explanation for why the agency apparently selected the nine-state average payment rate, but did not select the nine-state average yield. In fact, the agency selected a yield figure less than half that of the nine-state average.[11] Without any explanation in the record as to what factors the Secretary considered in determining revised figures, this court cannot effectively review the agency's actions.

The record regarding revisions to the arugula figures is similarly sparse. The record

---

covery by plaintiff on remand will be subject to the statutory payment cap.

**10.** In substance, this provision is identical to that in force when the events underlying this action occurred. "FSA" was substituted for "ASC" when Agricultural Stabilization and Conservation Service was succeeded by the Farm Service Agency.

**11.** The record includes basil data from Rhode Island, Connecticut, Idaho, Maine, Kentucky, Florida, Pennsylvania, New York and New Jersey. R. at 165. The yields for these states range from 14,992 (Rhode Island and Connecticut) to 2,000 (New York), and average 9,331. *Id.* The payment rates range from $0.96 (New Jersey) to $0.21 (Rhode Island and Connecticut), and average $0.66. *Id.*

shows that the 1994 arugula yield was originally established at 96,000 bunches per acre with a payment rate of $0.54 per bunch. R. at 173. Yet, there is no explanation in the record of the factors considered in selecting these figures. The record does reveal that the figures were compared to data from three other states and revised downward to 15,672 bunches per acre and $0.31 per bunch.[12] However, again there is no discussion in the record of the factors which lead the agency to select the particular revised figures it did. Without such explanation in the record, this court is unable to effectively review the agency's actions.

In some cases, when faced with an inadequate record, a court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). However, these new materials should be merely explanatory of the original record and should contain no new rationalizations. *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir.1977). In this case, the record contains no explanation of the agency's decision to revise the basil and arugula numbers or the rationale by which it selected the revised figures. Therefore, there are no existing rationalizations in the record which the agency could explain by supplementing the record before this court. That being the case, this Court will not request affidavits or testimony from the agency, but must remand the case. Consequently, both plaintiff's and defendant's motions for summary judgment on this point will be denied. In addition, for the same reasons, Plaintiff's Motion for Leave to File Supplemental Memorandum, Defendant's Motion for Leave to File a Response to Plaintiff's Supplemental Memorandum, and Plaintiff's Motion for Leave to File a Reply to Response will be denied.

### E. Was Plaintiff Denied Due Process?

■ In Count IV, plaintiff claims that he was denied due process because he was not provided with "a review hearing before a reviewing body above the county committee." Compl. at ¶ 22. However, defendant asserts, and plaintiff concedes, that according to Department of Agriculture appeal regulations, plaintiff had no right to reconsideration or review of general program requirements such as the rates and yields for determining disaster payments. *See* 7 C.F.R. § 780.2(b) (1996); Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at note 6. Therefore, plaintiff's motion for summary judgment as to Count IV will be denied.

## III. CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment will be denied; defendant's motion for summary judgment will also be denied. Because the record fails to explain the agency action adequately, the case is remanded to the Secretary to reconsider both the 1993 and 1994 decisions and to explain adequately why the original basil and arugula figures required revision and how the revised figures were selected.

Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment is denied; it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment is denied; it is

FURTHER ORDERED that Plaintiff's Motion for Leave to File Supplemental Memorandum, Defendant's Motion for Leave to File a Response to Plaintiff's Supplemental Memorandum, and Plaintiff's Motion for Leave to File a Reply to Response are denied; and it is

FURTHER ORDERED that this case be remanded for prompt further proceedings consistent with this Opinion; that Defendant

---

12. According to the record, "[t]he only other states on the East Coast known to established [sic] yields and rates for arugula are New York, New Jersey and Florida." R. at 189. New York and New Jersey had arugula yields of 10,000 bunches per acre and payment rates of $0.21 per bunch; Florida's yield was 15,672 bunches per acre and rate was $0.31 per bunch. *Id.* There is no explanation for why the agency adopted the Florida figures, rather than the New York/New Jersey numbers or an average of all three.

file a status report on or before January 15, 1997, advising this Court of the progress of those administrative proceedings; and that Defendant file subsequent status reports each 45 days thereafter.

IT IS SO ORDERED.