R.L. INVESTMENT LIMITED PARTNERS and Wanxuan Zou, Plaintiffs,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Defendant.

No. Civ. 98–00943 SOM.

United States District Court, D. Hawaii.

March 3, 2000.

Ronald K.K. Sakimura, Honolulu, Hawaii, for plaintiff R.L. Investment Limited Partners.

Thomas T.M. Ho, Honolulu, Hawaii, for plaintiffs.

Ronald T. Oldenburg, Honolulu, Hawaii, for plaintiffs.

Theodore G. Meeker, Office of the United States Attorney, Honolulu, Hawaii,

John C. Cunningham, Office of Immigration Litigation, Civil Division, Dept. of Justice, Washington, DC, for defendant.

## AMENDED ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MOLLWAY, District Judge.

Plaintiffs R.L. Investment Limited Partners ("RLILP") and Wanxuan Zou ("Zou") are challenging the denial by the Immigration and Naturalization Service ("INS") of Zou's petition for preferred visa status as an immigrant investor under section 203(b)(5) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1153(b)(5). At issue is whether the INS abused its discretion in denying Zou's application after granting almost identical petitions by others. Between the adjudication of Zou's petition and the adjudication of the other petitions, the INS issued precedent decisions that required the denial of Zou's petition. Because the INS did not abuse its discretion and because the INS did not announce new rules that should have been subjected to the notice and comment provisions of the Administrative Procedures Act ("APA"), the court grants summary judgment in favor of the INS and against Plaintiffs.

### BACKGROUND

#### I. The Immigrant Investor Program

In October 1990, Congress enacted section 203(b)(5) of the Immigration and Nationality Act of 1990, which provides that an alien investor may qualify for preferred visa status if the alien is "seeking to enter the United States for the purpose of engaging in a new commercial enterprise," "which the alien has established," and "which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens" or lawful aliens. 8 U.S.C. § 1153(b)(5)(A) (1999). Because the immigrant investor

program is the fifth preference in the "employment-based" visa preference category, it is commonly referred to as the "EB–5" program.

The statute imposes specific capitalization requirements for the purpose of creating jobs. The alien must have invested or be "actively in the process of investing" at least $1,000,000 in the new commercial enterprise, unless the investment is to be made in a "targeted employment area," in which case the investment must be at least $500,000. *Id.* § 1153(b)(5)(C)(i) to (ii).

Aliens may qualify for EB–5 preferred visa status by investing in a "regional center" and demonstrating by "reasonable methodologies" their compliance with the job creation requirements. Pub.L. No. 102–395, § 610, 110 Stat. 1874 (1992). The statute does not define "reasonable methodologies," but the minimum of ten full-time jobs may include "jobs which are estimated to have been created indirectly through revenues generated from increased exports." *Id.*

An alien seeking to obtain lawful permanent residence in the United States under the EB–5 statute must first file an I–526 petition. If the I–526 petition is approved, the immigrant investor (as well as dependents, if any) is admitted for permanent residence on a conditional basis. *See* 8 U.S.C. § 1186b(a)(1). The investor must subsequently file an I–829 petition to have the conditional status removed within ninety days of the second anniversary of his lawful admission for permanent residence. *See id.* §§ 1186b(c)(1), (d)(2). The EB–5 petition is granted if the INS determines that the alien sustained the required investment and entrepreneurial activities during the period of his conditional residency. *See id.* § 1186b(d)(1); *see also* 8 C.F.R. § 216.6(a)(4).

## II. *RLILP's EB–5 Program*

On August 8, 1996, RLILP, a Hawaii limited partnership, was formed to develop and operate a luxury retirement condominium project in Honolulu, Hawaii. RLILP is managed by its general partner, Pacific

M & A Group, Inc. Royal Lunalilo, Inc. and Jack L. Tyrell Acquisition Corp. are "original limited partners." To raise capital for the project, RLILP, with the assistance of experienced immigration counsel, devised an investment plan that would allow alien investors to immigrate to the United States under the immigrant investor program. Under the partnership agreement, an alien investor held "special distribution rights" that allowed him to ask for the return of his investment and offered a "priority return" of 4 percent per annum. *See* Exhibit D at 4, attached to Defendant's Motion for Summary Judgment.

Five investors—Sang Ro Lee, Chuan Chang, Chun Jung Chiu, Meng–Xiong Zhu, and Zou—filed EB–5 petitions with the INS for classification as immigrant investors based on their investment in RLILP. The petitions submitted by Lee, Chang, Chiu, and Zhu were granted. Zou's petition, filed the same day as Zhu's, was denied based on INS precedent decisions issued after Zhu's petition had been granted and while Zou's petition was still pending.

## III. *Precedent Decisions*

During the first four years of the immigrant investor program (fiscal years ("FY") 1992–95), the number of immigrant investor petitions ranged from 356 to 513. *See* Exhibit B at 3, attached to Defendant's Motion for Summary Judgment. Beginning in FY 1996, the number of petitions began to rise sharply, increasing from 801 in FY 1996 to 1,290 in FY 1997, and then to 1,368 in FY 1998. *Id.* The INS attributed the increase to the Immigrant Investor Pilot Program's liberalized standards and to marketing efforts overseas by American private sector promoters like RLILP. *Id.* at 5. Many of the petitions did not set forth proposals by individual aliens to invest in businesses they would start up and run themselves. Rather, numerous petitions reflected efforts by American organizations to recruit aliens to invest in them, typically as limited partners. The American organizations pro-

posed to use the aliens' capital in projects that would be controlled by persons other than the aliens. *Id.* INS adjudicators approved some of these innovative applications.

By late 1997, however, the INS had become aware that some of the EB–5 petitions contained features that appeared to be contrary to the immigrant investor regulations. Pending a full review of the situation, the INS placed an administrative hold on all EB–5 petitions with problematic features to prevent any more approvals that might be contrary to section 203(b)(5) and its regulations. *Id.* at 6.

In the summer of 1998, the Administrative Appeals Office ("AAO") published four "precedent decisions" addressing a number of the substantive issues that had arisen under the immigrant investor program: *Matter of Ho,* Int.Dec. No. 3362, 1998 WL 483979 (Exam.Comm. July 31, 1998); *Matter of Hsiung,* Int.Dec. No. 3361, 1998 WL 483978 (Exam.Comm. July 31, 1998); *Matter of Izummi,* Int.Dec. No. 3360, 1998 WL 483977 (Exam.Comm. July 13, 1998) (referred to by some as *Izummi* but more commonly known as *Izummi* by immigration specialists); *Matter of Soffici,* Int.Dec. No. 3359, 1998 WL 471519 (Evam.Comm. June 30, 1998).

These AAO decisions were designated pursuant to regulation to "serve as precedents in all proceedings involving the same issue(s). Except as these decisions may be modified or overruled by later precedent decisions, they are binding on all Service employees in the administration of the Act. Precedent decisions must be published and made available to the public." *See* 8 C.F.R. § 103.3(c) (1999).

Following the issuance of the precedent decisions, the immigrant investor petitions that had been subject to the administrative hold, one of which was Zou's petition, were adjudicated under the guidance of the precedent decisions.

## IV. *Denial of Zou's Petition*

Zou filed his petition on March 5, 1998, before the precedent decisions were is-

sued. *See* Exhibit E, attached to Defendant's Motion for Summary Judgment. At the time he filed his petition, the INS had not published any opinions or decisions validating Zou's form of investment for EB–5 purposes. At most, there were private publications that had disseminated nonbinding INS statements addressing arguably related EB–5 issues. On August 18, 1998, after the issuance of the precedent decisions, the Director of the INS's California Service Center denied Zou's petition based on the precedent decisions, particularly *Matter of Izummi. See* Exhibit A, attached to Plaintiffs' Motion for Summary Judgment.

The AAO affirmed the Director's decision denying Zou's petition on April 30, 1999. *See* Exhibit B, attached to Plaintiffs' Motion for Summary Judgment. The AAO based the affirmance on several grounds. First, the AAO found that Zou had not established a commercial enterprise, as required by 8 U.S.C. § 1153(b)(5)(A)(i). Second, the AAO found that Zou had not invested the amount of capital required by 8 U.S.C. § 1153(b)(5)(A)(ii) and 1153(b)(5)(C). Third, the AAO found that Zou had not made the qualifying investment required by 8 U.S.C. § 1153(b)(5)(A)(ii) and defined by 8 C.F.R. § 204.6(e). That is, Zou's right to redeem his capital within three years of his initial investment, along with the cap of 4 percent per annum on his rate of return, kept his financial arrangement from being an investment. Fourth, the AAO found that Zou had not met the requirements of 8 C.F.R. § 204.6(e) and 204.6(j)(3) that he document the source of his funds to assure that he had obtained them by lawful means. Fifth, the AAO held that Zou had not shown that RLILP's plan to build and operate a retirement condominium would generate the required number of jobs that could be attributed to him.

## V. *This Action*

On November 27, 1998, Plaintiffs filed a Complaint, amended on June 17, 1999, alleging that the INS had abused its discre-

tion and violated the APA, as well as the due process and equal protection clauses of the Constitution, by denying Zou's petition.

Both Plaintiffs and the INS filed motions for summary judgment.[1]

## STANDARD

### I. Summary Judgment

Summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED.R.CIV.P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Ca-*

---

1. The INS's opposition to Plaintiffs' Motion for Summary Judgment was untimely filed on Monday, January 3, 2000. It should have been filed no later than Thursday, December 30, 1999. Local Rule 7.4 states: "An opposition to a motion set for hearing shall be served and filed not less than eighteen (18) days prior to the date of the hearing." The hearing on this motion was set for Wednesday, January 19, 2000. Eighteen days before the hearing was Saturday, January 1, 2000. The opposition should have been filed on the preceding working day, which was Thursday, December 30, 1999 (Friday, December 31, 1999 was a federal holiday).

The INS apparently thought that its opposition was due on the working day following, rather than preceding, the eighteenth day before the hearing. In the hope that future filings will be timely, the court takes this opportunity to explain in detail why that was incorrect.

Defense counsel's reading would make a nullity of the words "not less than eighteen days." Those words were intended to avoid the very kind of date calculation that the INS adopted. Defense counsel relied on a misinterpretation of Rule 6 of the Federal Rules of Civil Procedure. Rule 6 provides that, when "the last day of a period" prescribed by court rule falls on a weekend, holiday, or other day on which the court is closed, the period runs "until the end of the next day which is not one of the aforementioned days." Local Rule 6.1 says that Rule 6 applies "[u]nless otherwise specified." Local Rule 1.3 states that the Local Rules "shall be construed so as to be consistent" with the Federal Rules of Civil Procedure. That consistency is achieved if the reference to "the next day" in Rule 6 is a reference to the working day before the eighteenth day referred to in Local Rule 7.4, not a reference to the working day after the eighteenth day. With Local Rule 7.4, one is counting backwards to ensure a minimum of eighteen days. If the eighteenth day is the "last day of a period," the "next day" is the nineteenth day before the hearing. This reading comports with both Rule 6 and the re-

quirement in Local Rule 7.4 of a minimum of eighteen days before a hearing. By contrast, if the "last day of a period" refers to a maximum (e.g., a response to a complaint must be filed within a maximum of twenty days after service of the complaint), rather than a minimum such as set forth in Local Rule 7.4, then "the next day" expands that maximum. In short, Rule 6 expands both the minimum and maximum. Defense counsel's reading would reduce a minimum but expand a maximum.

Local Rule 7.4 ensures the orderly submission of memoranda so that parties have an adequate opportunity to brief the court and the court has time to prepare for the hearing. If defense counsel's view were adopted, there would be abbreviated preparation times in some cases. In particular, the time in which a reply had to be filed (eleven days before the hearing) might be compressed. The problem would be aggravated in criminal cases. Criminal Local Rule 12.2 provides that an opposition to a motion shall be filed and served "not less than" six calendar days before a hearing, and any reply shall be filed and served "not less than" four days before the hearing. If defense counsel's reading of the "not less than" language were incorporated into the criminal rule, and if a hearing were scheduled for a Friday, then, under defense counsel's reading, the opposition could be filed the preceding Monday because the sixth day before the hearing was a Saturday. The reply, due four days before the hearing, would then be due the same day as the opposition!

Most private civil practitioners are already complying with the court's reading of the Local Rules. There is no reason government counsel should have different deadlines. Fortunately, with the typical civil motion, the deadlines all fall on working days and the calculation is simple. Thus, for example, for a motion scheduled to be heard on Monday, March 20, 2000, the opposition is clearly due on Thursday, March 2, 2000, and the reply is clearly due on Thursday, March 9, 2000.

*trett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party who fails to demonstrate facts to establish what will be an essential element at trial. *Id.* at 322, 106 S.Ct. 2548. The burden initially lies with the moving party to identify for the court "the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). The non-moving party may not rely on the mere allegations in the pleadings and instead must set forth "specific facts showing that there is a genuine issue for trial." *Id.* At least some " 'significant probative evidence tending to support the complaint' " must be produced. *Summers v. A. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987) (*citing Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587, 106 S.Ct. 1348), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.,* 809 F.2d at 631. All evidence and inferences must be construed in the light most favorable to the nonmoving party. *Id.* Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.*

## II. *Review of INS Determination*

■ A federal court may reverse the INS's denial of a preferential visa petition only if the INS abused its discretion. *Young v. Reno,* 114 F.3d 879, 883 (9th Cir.1997) (citing *Kaliski v. District Dir. of INS,* 620 F.2d 214, 216 n. 1 (9th Cir.1980)). The INS abuses its discretion if it bases its decision upon an improper understanding of the law. *Id.*

■ The Supreme Court has recognized that the construction of a statute by those charged with its administration is entitled to substantial deference. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations"); *McKart v. United States,* 395 U.S. 185, 193–94, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (an agency is created for purpose of applying a statute in the first instance). If reasonable and not contrary to the discernible intent of Congress, the agency's interpretation should be approved even though it is not the only reasonable interpretation or the one the reviewing court would make if deciding the issue in the first instance. *See Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381; *Department of Health and Human Servs. v. Chater,* 163 F.3d 1129, 1134–35 (9th Cir.1998) ("The question is not whether the interpretation represents the best reading of the statute, but whether it represents a reasonable one"). *See also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently

held agency view." *Young*, 114 F.3d at 883 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context." *INS v. Aguirre–Aguirre*, 526 U.S. 415, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590 (1999); *Jang v. Reno*, 113 F.3d 1074, 1077 (9th Cir.1997) ("Our review is especially deferential in the context of immigration policy").

▇ The court's review is based on the administrative record that was before the agency at the time of the agency's decision. *See Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1159 (9th Cir.1980) ("Predominant is the rule that agency action must be examined by scrutinizing the administrative record at the time the agency made its decision"); *Guy v. Glickman*, 945 F.Supp. 324 (D.D.C. 1996) ("It is well settled that judicial review of agency action is generally restricted to the full administrative record before the agency at the time the decision was made.... The focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court"). In deciding the present motions, this court will not consider evidence such as the expert opinion of Michael J. O'Malley and the affidavit of Richard Bahar, which the AAO did not have.

## DISCUSSION

Because the INS denied Zou's petition on multiple alternative grounds, Plaintiffs can succeed on their challenge to the INS's denial of Zou's petition only if they show that the INS abused its discretion with respect to all of the INS's enumerated grounds. For purposes of this appeal, the INS, by contrast, must show only that it had one ground for denial.

I. *The INS Did Not Abuse Its Discretion.*

▇ Plaintiffs argue that the INS abused its discretion by denying Zou's petition after having granted substantially similar petitions by other RLILP investors. The parties agree that the difference results from the INS's publication of four precedent decisions between the time Zou's petition was adjudicated and the time the INS decided the other RLILP investors' petitions. Plaintiffs argue that, under *Ruangswang v. INS*, 591 F.2d 39 (9th Cir.1978), *Patel v. INS*, 638 F.2d 1199 (9th Cir.1980), and *Bahat v. Sureck*, 637 F.2d 1315 (9th Cir.1981), it was an abuse of discretion for the INS to rely on the change in the law effected by the precedent decisions. This court disagrees.

*Ruangswang, Patel*, and *Bahat* are distinguishable from the present case.

In *Ruangswang*, the petitioner, a native and citizen of Thailand, claimed to be exempt from a labor certificate requirement because she was an "investor" under 8 C.F.R. § 212.8(b)(4) (1974). 591 F.2d at 41. She had purchased a small business for approximately $13,300, thereby meeting the minimum investor requirement of $10,000 for qualification under section 212.8(b)(4). *Id.* at 42. The INS took the position that merely meeting the objective criteria in the statute was insufficient to qualify for investor status. The investment was instead required to be "substantial." *Id.* at 43. The Ninth Circuit held that the Board of Immigration Appeals ("BIA") had abused its discretion by requiring an investment that was greater than the regulation required. *Id.* at 46.

The provision at issue in *Ruangswang* contained "objective" criteria (a $10,000 investment, and one year's experience or qualified training), which the petitioner had clearly met. There "simply [was] no room for the agency to interpret the regulation so as to add another requirement." *Id.* at 43–44. By contrast, in applying the precedent decisions here, the INS did not add any requirement.

In *Patel*, petitioners, citizens of India, entered the United States and were authorized to stay until July 31, 1974. 638 F.2d at 1200. The Patels failed to depart at the end of their authorized stay and applied

for an adjustment of status. Mr. Patel attempted to establish his eligibility for adjustment of status by qualifying for the "investor exemption." He introduced evidence that, in 1974, he had invested $13,-500 in a motel, and that, before arriving in the United States, he had worked in an Indian guest house for more than one year. Despite Patel's apparent compliance with the criteria set forth in 8 C.F.R. § 212.8(b)(4), the BIA found that Patel did not qualify for the investor exemption. *Id.* In addition to the investment of $10,000 and one year of experience in the field of investment, the BIA required that Patel's investment "tend to expand job opportunities" in the United States. *Id.* The Ninth Circuit held that the BIA had abused its discretion by requiring this additional factor. Patel had established his eligibility for adjustment of status by compliance with the clear criteria of 8 C.F.R. § 212.8(b)(4). *Id.* at 1205. The court found that the BIA had attempted to add a requirement by adjudication that had been expressly discarded during its rulemaking proceedings. *Id.* at 1204.

Bahat, a native of Germany and a citizen of Israel, claimed to qualify for the "investor exemption" by reason of his investment of $10,000 in an electrical contracting business and his prior experience as an electrician. 637 F.2d at 1316–17. As in *Patel,* the INS sought to impose requirements beyond those enumerated in 8 C.F.R. § 212.8(b)(4). As in *Patel,* the Ninth Circuit found that this was an abuse of discretion. *Id.* at 1320.

■ These three cases stand for the proposition that an agency abuses its discretion when its decisions either are contrary to the plain language of a statute or regulation or add a requirement not contained in the statute. Here, Plaintiffs do not argue that there is a statute, regulation, or published decision interpreting the immigrant investor statute that has been contravened, either by an additional requirement or a contrary interpretation. Rather, Plaintiffs argue that the INS's decision contravened *unpublished* deci-

sions and memoranda. Plaintiffs cite, in particular, the INS decisions granting the first four RLILP petitions. But an unpublished disposition carries no precedential weight. *See Chan v. Reno,* 113 F.3d 1068, 1073 (9th Cir.1997) (citing 8 C.F.R. § 3.1(g)). As the Ninth Circuit says, "[U]npublished precedent is a dubious basis for demonstrating the type of inconsistency which would warrant rejection of deference." *Id.* (citing *De Osorio v. INS,* 10 F.3d 1034, 1042 (4th Cir.1993)).

■ Plaintiffs also point to a 1993 General Counsel opinion. General Counsel opinions are advisory in nature and do not bind the INS. *See* Deposition of Kathy Anne Redman at 20, attached as Exhibit D to Plaintiffs' Reply. Even apart from its advisory nature, the General Counsel opinion referred to by Plaintiffs was not a statement on which Plaintiffs were entitled to rely. It was, like the RLILP decisions, unpublished. The General Counsel opinion was printed only in a private, albeit widely circulated, immigration publication lacking a designation by the INS of authoritativeness. Nor did the General Counsel opinion address the statutory provisions at issue in the INS's decision to deny Zou's petition. The General Counsel opinion interpreted the phrase "at risk," a term not at issue in the denial of Zou's petition. For all of these reasons, the General Counsel opinion could not be said to constitute INS policy wrongfully contravened by the decision denying Zou's petition.

Plaintiffs' remaining arguments with respect to the INS's alleged abuse of discretion ask the court to hold that the precedent decisions are bad policy. The court is not the arbiter of immigration policy.

Plaintiffs, for example, challenge the INS's finding that Zou did not "invest," as that term is defined by statute and regulation. Zou proposed to meet the requirement by "investing" $500,000 in RLILP. Zou, however, was to receive a "preferential" fixed rate of return of 4 percent per annum on his money, along with RLILP's

promise to repay him in three years from the date that his visa application was approved. *See* Exhibit F at 2, 13, attached to Defendant's Motion for Summary Judgment ("Three years after the Investor's initial visa application has been approved and the funds disbursed to the R.L. Investment Limited Partnership, the Investor will be repaid his original investment of $500,000 plus an additional 4% per annum for each of the three years that the funds were invested"). *See also* Exhibit D at 4, 6, attached to Defendant's Motion for Summary Judgment (the partnership agreement entitled Zou to a "priority return" of 4 percent per annum and "special distribution rights" that allowed him to ask for repayment of his adjusted capital account within ninety days of the end of his third full year as a limited partner); Exhibit G, attached to Defendant's Motion for Summary Judgment (stating that payment of the 4 percent preferred return and repayment of the original investment would take precedence over the distribution of profits, and describing the alien's right to demand repayment of his investment with interest as an "exit strategy").

The INS, relying on *Matter of Izummi*, rejected this investment strategy. It found that, for purposes of meeting the statutory and regulatory definition of "invest" (or "contribution of capital"), an alien may not enter into an agreement before the end of his two-year conditional residence period that grants him the right to sell his interest back to the partnership. Such an agreement, according to the INS, converts the alien's capital from the required equity investment into a loan. The INS referred to 8 C.F.R. § 204.6(e) (1999), which defines the term "invest" as follows: "[i]nvest means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, *or any other debt arrangement* between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part." 8 C.F.R. § 204.6(e) (1999) (emphasis added).

Because the partnership agreement allowed Zou to get his money back after a set period of time, the INS considered the transaction a debt arrangement. Plaintiffs point out that Zou risked ultimately losing his initial investment if RLILP was unprofitable. As the AAO stated, this only meant that the loan was unsecured. It does not negate the INS's conclusion that Zou had a debt arrangement.

There is admittedly no simple rule for distinguishing debt from equity. One might conclude that Zou's lack of any right to share in any of RLILP's profits above 4 percent per annum rendered Zou's agreement a debt arrangement. Such a conclusion would not be clearly erroneous. *See generally* Exhibit D, attached to Defendant's Motion for Summary Judgment (section 3.1 of the partnership agreement allocates profits, of which 4 percent per annum goes to the limited partners, with 99 percent of the remainder going to the "original limited partners" (Royal Lunalilo, Inc. and Jack L. Tyrell Acquisition Corp.) and 1 percent to the general partner (Pacific M & A Group, Inc.)). Courts have held that severe limitations on the right to share in profits suggest a party is a creditor rather than an equity stakeholder. *See, e.g., Santa Fe Gaming Corp. v. Hudson Bay Partners, L.P.*, 49 F.Supp.2d 1178 (D.Nev.1999) ("The term 'equity' indicates ownership or a right to share in the profits of the corporation").

The court will not disturb the INS's interpretation of the term "invest" even if, as Plaintiffs argue, that interpretation "ignor[es] business reality." *See* Plaintiffs' Memo. in Opp. at 14. According to Plaintiffs, "all investors in whatever kind of business want to minimize their risk. The EB–5 regulations require that the investment be 'at risk' but do not require that the risk be maximized or subjectively large in INS's eyes. Disallowing a buy-back arrangement is unrealistic because there is no market for selling the investor's partnership interest to the public." *Id.* It is not the court's place "to decide which among several competing interpretations

best serves the regulatory purpose." *See Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. Such a decision would implicate policy, not law. The agency's interpretation must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Id.*

Here, the INS's definition of "invest" rationally advances the job-creation purposes of the statute by requiring that a qualifying EB–5 investment be in the nature of equity rather than a loan. If the alien has placed his money fully at risk with no expectation of reimbursement, he is more likely to be involved in the enterprise (even if he is only a limited partner), and his entrepreneurial talents are more likely to be brought to bear on advancing the enterprise's success, with the concomitant creation of jobs that Congress envisioned. When there is no repayment requirement, the enterprise's managers are free to use the money to stimulate the economy and create jobs, instead of holding funds in reserve to repay the alien. Thus, the court cannot say that the INS abused its discretion in denying Zou's petition.

## II. *The INS Did Not Violate the APA.*

Plaintiffs contend that, even if the result reached by the INS was reasonable, the process violated the APA's rulemaking requirements. Plaintiffs say the INS's denial of Zou's petition was based on a reversal of INS policy. Such a reversal, Plaintiffs assert, required the INS to go through the APA's "notice and comment" period, which the INS failed to do. The court does not agree that the INS's issuance of the precedent decisions or denial of Zou's petition involved rulemaking.

Section 553 of the APA requires agencies to submit all proposed "legislative rules" to a notice and comment period. *See* 5 U.S.C. § 553(b) (1999). Agencies, however, need not follow such a course before adopting "interpretive rules." *Id.* § 553(b)(3)(A).

Interpretive rules are those "which merely clarify or explain existing law or regulations." *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983). "These rules are essentially hortatory and instructional in that they go more to what the administrative officer thinks the statute or regulation means, when applied in particular, narrowly defined, situations." *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984). A rule that "effect[s] a change in existing law or policy" is legislative. *Powderly*, 704 F.2d at 1098.

As discussed above, neither the INS's precedent decisions nor its denial of Zou's petition effected a change in existing law. The INS was not contravening any statute, regulation, or published decision. The most Plaintiffs can point to is an unpublished policy that they say was contravened by the INS. However, there was not an unpublished policy with respect to *every* ground on which the INS based its denial of Zou's petition.

Any unpublished policy articulated in the General Counsel opinion discussed above addressed matters other than those raised in the denial of Zou's petition.

The four RLILP investor petitions that the INS granted are insufficient evidence of an INS "policy." The record contains no evidence of other petitions granted under similar circumstances. The four RLILP petitions were merely mistakes.

Administrative agencies make mistakes; they should be allowed to correct those errors. *See National Labor Relations Bd. v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953) (" 'Cumulative experience' begets understanding and insight by which judgments not objectively demonstrable are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process"). It would be ridiculous to require the INS to grant a petition because it had previously granted a similar petition by mistake. That is precisely why unpublished decisions do not create precedent. The agency

recognizes that they may be unimportant for wider purposes or, for that matter, may be questionable. Only when the agency specifically designates a decision as precedent can it bind future decisions. *See* 8 C.F.R. § 103.3(c) (1999).

*Chief Probation Officers of Cal. v. Shalala*, 118 F.3d 1327 (9th Cir.1997), is persuasive here. At issue in *Chief Probation Officers* was whether the Department of Health and Human Services' issuance of a rule that terminated federal matching funds for state juvenile justice programs was void because the DHHS had not satisfied the APA's notice and comment requirement. The Ninth Circuit held that the directive was an "interpretive" rule exempt from the notice and comment mandate. The claimants had argued that, in issuing the rule, "HHS contradicted what in effect had become a regulation by the Agency's past practice of approving plans allowing reimbursement for juvenile justice funds." *Id.* at 1334. The Ninth Circuit disagreed, finding that the "prior state plan approvals, which themselves did not go through formal rulemaking procedures, cannot be regulations having the force of law. The prior approvals simply represented the Agency's prior (short-lived) interpretation of the statute. The Agency was free to change that interpretation." *Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 517–18, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (Secretary not estopped from changing legal interpretation that she believes to be erroneous)).

■ Here, Plaintiffs rely chiefly on the INS's approval of four RLILP investor provisions to demonstrate that the INS instituted a legislative rule change. However, as *Chief Probation Officers* held, changes in interpretations "which themselves did not go through formal rulemaking procedures, cannot be regulations having the force of law. The prior approvals simply represented the Agency's prior (short-lived) interpretation of the statute." *See id.* Because the INS was free to change its interpretation, no notice and comment period was required.

III. *Zou's Failure To Document Sufficiently The Source Of His Funds Is An Alternative Ground on Which The INS's Decision is Affirmed.*

Even if the issuance of the precedent decisions constituted rulemaking and required APA compliance, this court would still affirm the INS's decision to deny Zou's petition.

■ One of the bases for denial of Zou's petition articulated by the INS was Zou's failure to document the source of his capital. Under 8 C.F.R. § 204.6(j)(3), an immigrant investor must show that he has invested, or is actively in the process of investing, capital obtained through lawful business means. The alien must, along with the petition, submit applicable evidence, such as foreign business registration records; corporate, partnership, and personal tax returns; evidence identifying any other source(s) of capital; or certified copies of any judgments.

Zou submitted his own affidavit stating that the source of the funds was a $500,000 gift from his uncle and a certificate of deposit dated January 30, 1998, in the amount of $1,004,571.51. Citing *Matter of Izummi*, in which the petitioner was held not to have met his burden of establishing the source of his funds because he had not documented the path of the funds, the District Director found that Zou's evidence was insufficient. Zou had not submitted documentation to "further clarify the actual origins or chain of transfer of the bank deposit or to otherwise illustrate the uncle's level of income."

On appeal from the Director's decision, Zou, aware that he had been found lacking with respect to establishing the source of his capital, failed to supplement his documentation. Unlike judicial review of an administrative decision, which is limited to the record before the agency decision maker, an appeal to an administrative review board may involve supplementation of the record that was before the original agency decision maker. While Plaintiffs' counsel noted at the hearing on the present mo-

tions that the AAO has, in some cases, refused to accept new evidence, he was forthright in conceding that the AAO has sometimes accepted additional evidence. The parties do not dispute the absence of any statutory, regulatory, or other bar to the AAO's acceptance of new evidence.

Instead of submitting the necessary evidence, Zou said only that "additional documentation to establish the source of funds can be submitted after the other issues are resolved." The AAO noted in response that "[n]o provision exists for a petitioner to address at first only the issues he chooses to address, and then to preserve his right to address other issues separately at some later date." Accordingly, the AAO concluded, "The petitioner's refusal to submit further evidence on the issue of source of funds constitutes an acceptance of the director's finding." The court agrees with the AAO.

The plain language of section 204.6(j)(3) makes it clear that petitioners have always been obligated to document the source of investment funds. Section 204.6(j)(3) requires more than a petitioner's affidavit. Documentary evidence, in the form of, for example, tax returns and foreign business registration records, is required. *Izummi* merely reemphasized an existing requirement that an immigrant investor document the lawful means through which the capital he contributes has been acquired. *Izummi* does not effect a substantive change in the law; at most, it enforces the requirement of proof set forth in section 204.6(j)(3)0.

 Even if the INS's requirement of documentation of the source of Zou's funds constituted a new rule, this particular rule could have been implemented by adjudication. "The Supreme Court has determined that an administrative agency, such as the INS, 'is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the (agency's) discretion.'" *See Patel,* 638 F.2d at 1203 (citing *NLRB v. Bell Aerospace Co.,* 416 U.S.

267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)). The cases most suited to rulemaking through adjudication are those that can be applied effectively on a case-by-case basis. *Id.* at 1204. As the Ninth Circuit in *Patel* noted:

> (P)roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.

*Id.* (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1995)). Documentation is a matter especially appropriate for rulemaking by adjudication because different factual circumstances require different types of proof. It would be impossible for a rule to articulate the differing proof required by differing circumstances.

Knowing that the District Director of the California Service Center had found his documentation inadequate, Zou failed to provide the requisite documentation. His failure dooms this appeal.

## IV. *Estoppel*

Plaintiffs argue that the INS should be estopped from denying Zou's petition because the INS previously granted the four other RLILP petitions.

 Estoppel is an equitable doctrine invoked to avoid injustice. *Heckler v. Community Health Servs.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). "[T]he Government may not be estopped on the same terms as any other litigant." *Id.* at 60, 104 S.Ct. 2218. A plaintiff seek-

ing to estop the government must show that the government engaged in some form of affirmative misconduct that was beyond negligence. *OPM v. Richmond,* 496 U.S. 414, 421, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (recognizing that some form of affirmative misconduct might give rise to an estoppel claim against the government but noting that the Supreme Court has "reversed every finding of estoppel that [it] has reviewed"); *Watkins v. U.S. Army,* 875 F.2d 699, 707 (9th Cir. 1989), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990).

 Estoppel is not warranted here. There is no showing that the INS acted wilfully or recklessly to deprive Plaintiffs of any rights. There is no showing that the INS deliberately granted the first four petitions and denied Zou's petition for any improper purpose. *See Mukherjee v. INS,* 793 F.2d 1006, 1009 (9th Cir.1986) (finding that the an immigration official's assurance to plaintiff that he was not subject to a two-year residency requirement did not constitute affirmative misconduct when there was no indication that the official lied or there was "a pattern of false promises").

Even if the court had found affirmative misconduct, "the government cannot be estopped unless its acts also threaten to work serious injustice and the public's interest will not be unduly damaged by the imposition of estoppel." *See Watkins,* 875 F.2d at 707.

There is no serious injustice here. Any hardship to Zou appears to be minimal. Zou still has his $500,000 investment. That money was put in an escrow account to be released on condition that his visa petition was approved.[2] Zou may reapply for an immigrant investor visa in accordance with the statute, regulations, and the four precedent decisions. Any hardship to other individual RLILP investors is irrelevant to these motions, as those persons are not parties to this case. While RLILP claims it will suffer financial hardship, it has not provided sufficient evidence to support its claim. Accordingly, the court declines to reverse the INS's decision on estoppel grounds.

*CONCLUSION*

For the reasons stated above, the court GRANTS the INS's Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment. The clerk of the court is directed to enter judgment in favor of the INS.

IT IS SO ORDERED.

---

2. It appears from the record that Zou placed his $500,000 in an escrow account contingent on the granting of his visa petition. The sample escrow agreement included with the RLILP informational materials states that, if the petition is not approved within nine months because of a finding that the partnership does not qualify as an investment, the petitioner will receive a refund of the entire amount, plus interest, and the partnership will bear the escrow costs.