**SPENCER ENTERPRISES, INC., Li–Hui Chang, Chung–Chuan Sun, Jerry Chien–Hua Raan, Ping–Fu Lu, Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. 99–CV–6117.**

United States District Court, E.D. California.

March 28, 2001.

Russell K. Ryan, Holland and Hart LLP, Salt Lake City.

H. Ronald Klasko, Philadelphia, PA.

Linda Anderson, U.S. Atty's Office, Fresno, CA.

Nelda C. Reyna, U.S. Dept. of Justice Office of Immigration Litigation, Washington, DC.

MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' RULE 12(b)(1) MOTION TO DISMISS, AND CROSS MOTIONS FOR SUMMARY JUDGMENT

WANGER, District Judge.

## I. INTRODUCTION

This matter is before the court on three motions: cross summary judgment motions as to Plaintiff Li–Hui Chang's claims

and defendants' motion to dismiss the claims of plaintiffs' Chung–Chuan Sun and Jerry Chien–Hua Raan for lack of subject matter jurisdiction because Sun and Raan have not exhausted their administrative remedies. The matter was heard on September 8, 2000.

## II. *LEGAL STANDARDS*

### A. *MOTION TO DISMISS*

█ A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) addresses the court's subject matter jurisdiction, derived from the case or controversy clause of Article III of the U.S. Constitution. Federal courts are limited in jurisdiction; it is presumed that a case lies outside the jurisdiction of the federal courts unless Plaintiff proves otherwise. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 376, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221 (9th Cir.1989); *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979). A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may be made as a "speaking motion" attacking the existence of subject matter jurisdiction in fact. *See Thornhill Publishing*, 594 F.2d at 733.

█ In a facial attack on the complaint, the court must consider the allegations of the complaint as true. *See Mortensen v. First Federal S & L Ass'n*, 549 F.2d 884, 891 (3rd Cir.1977); *see also, NL Indus. Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). The motion will be denied unless the allegations appear to be frivolous. *See Black v. Payne*, 591 F.2d 83, 86 n. 1 (9th Cir.), *cert. denied*, 444 U.S. 867, 100 S.Ct. 139, 62 L.Ed.2d 90 (1979).

█ A 12(b)(1) motion may "attack the existence of subject matter jurisdiction in fact, quite apart from any pleading," as a speaking motion. *See Mortensen*, 549 F.2d at 891; *Thornhill Publishing*, 594 F.2d at 733, *FDIC v. Nichols*, 885 F.2d 633, 635–36 (9th Cir.1989). Defendant may "rely on affidavits or any other evidence properly before the court." *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.) (citations omitted), *cert. denied*, 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539, (1989). "It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *See* id.

> [I]n a factual 12(b)(1) motion ..., *no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.*

*See Mortensen*, 549 F.2d at 891 (emphasis added).

█ Although deference is given to a plaintiff's factual allegations in a 12(b)(6) motion, plaintiff's allegations need not be taken as true when considering a Rule 12(b)(1) motion. *See Thornhill Publishing*, 594 F.2d at 733. No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *See Trentacosta v. Frontier Pacific Aircraft Industries*, 813 F.2d 1553, 1557–58 (9th Cir.1987).

### B. *MOTION FOR SUMMARY JUDGMENT*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law." *See 7–Up Bottling Co. of Jasper Inc. v. Varni Brothers Corp. (In re Citric Acid Litig.),* 191 F.3d 1090, 1093 (9th Cir. 1999) (quoting FED. R. CIV. P. 56(c)). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *See U.A. Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1995).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995); *see also Van Westrienen v. Americontinental Collection Corp.,* 94 F.Supp.2d 1087, 1094 (D.Or.2000) (when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required) (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1470 (9th Cir.1987)). Nevertheless, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in its favor. *See Murphy Exploration & Prod. Co. v. Oryx Energy Co.,* 101 F.3d 670, 673 (Fed.Cir. 1996) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A court's role on summary judgment, however, is not to weigh the evidence, *i.e.,* issue resolution, but rather to find genuine factual issues. *See Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).[1]

## III. BACKGROUND

### A. UNDISPUTED FACTS

This action was filed August 4, 1999 by, *inter alia,* plaintiffs Li–Hui Chang

---

**1.** Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n. 1 (9th Cir.1996); *Anheuser–Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration.

*See United States v. 1 Parcel of Real Prop.,* 904 F.2d 487, 491–92 (9th Cir.1990). Supporting and opposing affidavits must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. *See* FED. R. CIV. P. 56(e); *Conner v. Sakai,* 15 F.3d 1463, 1470 (9th Cir.1993), *rev'd on other grounds sub nom., Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

("Chang"), Chung–Chuan Sun ("Sun"), and Jerry Chien–Hua Raan ("Raan"), requesting declaratory and injunctive relief against the United States of America and the United States Department of Immigration and Naturalization Services. *See* Doc. 1 ¶ 1. Each plaintiff is a citizen of Taiwan who seeks a United States visa under 8 U.S.C. § 1153(b)(5). *See* ¶¶ 2–4, 11. The Immigrant Investor Act ("EB–5") [2] provides a preference for admitting aliens who engage in enterprises that create jobs:

(A) In general

> Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise-

>> (i) which the alien has established,

>> (ii) in which such alien has invested (after November 29, 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and

>> (iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

*See* 8 U.S.C. § 1153(b)(5). The amount of capital required generally is $1,000,000. *See* id. at § 1153(b)(5)(C)(i). The Attorney General, however, has the discretion to reduce the required amount to a statutory

floor of $500,000, if the investment is to be made in a targeted employment area, *see* id. at § 1153(b)(5)(C)(ii), or to increase the amount if the area has an unemployment rate significantly below the national average, with a statutory ceiling of $3,000,000, *see* id. at § 1153(b)(5)(C)(iii).

By late 1997, the INS became aware that many petitions being adjudicated were contrary to the immigrant investor regulations. *See R.L. Invest. Ltd. Partners v. INS*, 86 F.Supp.2d 1014, 1018. In turn, the INS placed an administrative hold on all problematic immigrant investor applications for further investigation. *See* id. On May 4, 1998, Chang filed her original EB–5 application. *See* A.R. 551. Chang's EB–5 application was placed on hold pending issuance of the precedent decisions. *See* A.R. 426; Complaint at ¶ 30. She was given the option to withdraw her original petition and file a new one or accept adjudication of the petition as initially filed. Chang withdrew her petition and submitted a new petition to overcome elements which gave rise to the INS' mandated hold and to comply with the four precedent decisions. A.R. 427, 544, 556.

The Federal Regulations provide that the INS may designate particular Administrative Appeals Office ("AAO") decisions to "serve as precedents in all proceedings involving the same issue(s). Except as these decisions may be modified or overruled by later precedent decisions, they are binding on all Service employees in the administration of the Act. Precedent decisions must be published and made available to the public." *See* 8 C.F.R. § 103.3(c).

---

**2.** 8 U.S.C. § 1153(b)(5) is the fifth preference within the "employment-based" visa preference category and is commonly referred to as the "EB–5" program. *See R.L. Investement*

*Limited Partners v. Immigration and Naturalization Serv.*, 86 F.Supp.2d 1014, 1016–17 (D.Haw.2000) ("RLILP").

In the summer of 1998, the AAO published four precedent decisions to provide guidance and resolve many of the problems that led to the administrative hold. *See In re Soffici*, Int. Dec. No. 3359, 1998 WL 471519 (1998); *In re Izummi*, Int. Dec. No. 3360, 1998 WL 483977 (1998); *In re Hsiung*, Int. Dec. No. 3361, 1998 WL 483978 (1998); *In re Ho*, Int. Dec. No. 3362, 1998 WL 483979 (1998).

On approximately September 14, 1998, Chang filed a second EB–5 petition. *See* A.R. 427, 544, 556. On October 15, 1998, the INS made a detailed request for additional information (INS Form 797) regarding Chang's new petition. *See* A.R. 550–555. The INS noted that the business plan submitted with Chang's EB–5 application was more of an "executive summary." *See* A.R. 552–555. The INS specifically requested that Chang submit a business plan that was comprehensive, detailed, and *credible* in accordance with *In re Ho*. *See* A.R. 552. The INS explained that there was also insufficient evidence demonstrating employment of 10 full-time employees and insufficient evidence documenting the source of Chang's and her husband's income. *See* 552–555. Chang submitted voluminous documents in response to the INS request. *See* A.R. 278–424.

On January 27, 1999, the INS denied Chang's EB–5 application and notified her of her right to appeal to the AAO. *See* A.R. 268–274. Chang appealed the decision to the AAO, *see* A.R. 28–67, and on April 26, 1999, the AAO affirmed the denial of Chang's petition. *See* A.R. 6–27. On May 28, 1999, Chang submitted a Motion to Reopen and Reconsider the decision of the AAO. *See* A.R. 3. The motion was dismissed on February 2, 2000. *See* Pl. Mot. for S.J. at P. 12.

This suit challenges the INS' adjudication of, *inter alia*, the petitions of plaintiffs Chang, Sun, and Raan. Plaintiff Chang alleges the INS abused its discretion in denying her I–526 on April 26, 1999. *See* Doc. 1 ¶ 2. Plaintiff Sun alleges the INS has issued a notice of intent to deny his petition. *See id.* ¶ 3. Plaintiff Raan also alleges INS has issued a notice of intent to revoke his status. *See id.* ¶ 4.

## IV. ANALYSIS

### A. DISCUSSION: DEFENDANTS' MOTION TO DISMISS

Defendants argue that the claims of Sun and Raan should be dismissed under Section 12(b)(1) for lack of subject matter jurisdiction because they have not exhausted their administrative remedies. *See* Doc. 47 at 12:9–17. Plaintiffs rejoin that this motion to dismiss is improper, because at the December 9, 1999 hearing, the parties and the Court agreed to hold the Sun and Raan claims in abeyance to first expedite resolution of Chang's petition and to adjudicate the remainder of the Complaint thereafter. *See* Doc. 63 at 26:17–21. More specifically, plaintiffs argue that these claims should be decided only following the opportunity for plaintiffs to conduct discovery. *See id.* at 28:25–26. The INS responds that no discovery is permitted in a judicial review of administrative agency action case. *See McKart v. United States*, 395 U.S. 185, 194–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

To successfully oppose a motion to dismiss for lack of subject matter jurisdiction, the nonmoving party must present evidence outside the pleadings that a genuine issue of material fact exists as to subject matter jurisdiction. *See Trentacosta v. Frontier Pacific Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th Cir.1987). Although [t]he decision whether to grant or deny a visa petition lies within the discretion of the INS, *see Black Construction Corp. v. Immigration and Naturalization*

*Service,* 746 F.2d 503, 504 (9th Cir.1984), a district court can review a final decision of the INS Administrative Appeals Office ("AAO"). *See Ruiz–Rivera v. Moyer,* 70 F.3d 498, 500 (7th Cir.1995) (listing in the procedural history that after an adverse ruling by the AAO, plaintiff properly filed suit in district court); *Republic of Transkei v. Immigration and Naturalization Serv.,* 923 F.2d 175, 176 (D.C.Cir.1991) (same). A district court, however, lacks jurisdiction until the visa petitioner has exhausted administrative remedies. The first issue is whether a final decision by the AAO has been entered and served on each petitioner. Here, in response to discovery requests, the INS provided plaintiffs with the administrative records in their cases.

■ As to Plaintiff Sun, although he contends a notice of intent to deny his EB–5 visa application has been issued in his case, *see* Doc. 1 ¶ 46, the administrative record *contains no such notice. See* Doc. 47 at 12:18–13:6. Absent a final decision by the AAO, a district court does not have jurisdiction over a claim for relief from final action by an administrative agency. No argument is made that exhaustion is futile. The claims of plaintiff Sun are appropriately DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

■ As to plaintiff Raan, his EB–5 application was approved December 3, 1996. On April 25, 1997, he applied for adjustment of status to that of permanent resident. On June 3, 1999, the CSC issued a Notice of Intent to Revoke. On July 3, 1999, Raan filed a Response to Notice of Intent to Revoke. No further action has been taken by the INS. There has been no final administrative action taken in his case. No argument is made that exhaustion

is futile. The claims of plaintiff Raan are appropriately DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.[3]

### B. *THE CROSS–MOTIONS FOR SUMMARY JUDGMENT*

#### 1. *REGULATORY ISSUES LEADING TO PRECEDENT DECISIONS*

Commencing in FY 1996, the number of applications under the Immigrant Investor Program began to rise sharply from a range of 356 to 513 during the first four years of the program to 1,368 in FY 1999. *See RLILP,* 86 F.Supp.2d at 1017. The INS recognized that the increase was attributable to liberalized standards of the Immigrant Investor Pilot Program, marketing efforts overseas, and United States-based private sector promoters who recruited aliens to invest in business transactions with United States-based businesses, proposing to use the aliens' capital in projects conceptualized, controlled and administered by the United States-based business. *See* id. Such programs were facilitated by the formation of limited partnerships permitted under the regulations. See 8 C.F.R. § 204.6(j)(5)(iii) (1999).

The Commissioner of the INS acts under authority delegated by the Attorney General. *See* 8 C.F.R. § 2.1 (1999). Appellate jurisdiction over petitions for immigrant investor status is delegated to the Associate Commissioner for Examinations, *see* 8 C.F.R. § 103.1(f)(3)(iii)(B), who exercises this authority by supervising the Director of Administrative Appeal, § 103.1(f)(3)(i); *see also* § 103.3(a)(1)(iv) (Administrative Appeals Unit [now Admin-

---

**3.** Although it appears that Ping–Fu Lu is a named plaintiff in this case, plaintiffs make no claims on his or her behalf, nor is there any documentation on his or her behalf. Ping–Fu Lu is dismissed without prejudice for failure to state a claim.

istrative Appeals Office] "is the appellate body which considers cases under the appellate jurisdiction of the Associate Commissioner, Examinations").

INS regulations authorize the INS to designate particular AAO decisions to "serve as precedent in all proceedings involving the same issue(s)." These decisions are binding on all INS employees in administration of the Act and must be published and made available to the public. *See* 8 C.F.R. § 103.3(c).

### 2. *REVIEW OF INS DETERMINA-TION*

 A district court has jurisdiction under the Administrative Procedures Act ("APA") to review a final INS decision that denies a visa petition. *See Ruiz–Rivera,* 70 F.3d at 500. The general standard of review of an administrative decision is whether the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). In the context of a visa petition, [t]o be entitled to relief, a plaintiff's facts must show that the INS's denial of the petition amounted to an abuse of discretion. *See Young v. Reno,* 114 F.3d 879, 883 (9th Cir.1997); *see also Gao v. Jenifer,* 185 F.3d 548, 552 (6th Cir.1999). The INS abuse[s] its discretion if its decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular group. *See* id. Judicial review of agency action is limited to review of the administrative record, *see Black Construction Corp. v. Immigration and Naturalization Serv.,* 746 F.2d 503, 505 (9th Cir. 1984), and is entitled to substantial deference, *see Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Where the issue concerns interpretation by a federal agency of a statute and the agency's regulations, which the agency administers and enforces and where Congress has expressed no intent on the precise question, the court's review is deferential and circumscribed. *See Thomas Jefferson, supra,* 512 U.S. at 512, 114 S.Ct. 2381; *Jang v. Reno,* 113 F.3d 1074, 1076 (9th Cir.1997).

 "Although the Constitution fails to delegate specifically the power over immigration, the Supreme Court recognized that ... the political branches have plenary authority over immigration matters as an inherent concomitant of national sovereignty." *See Jean v. Nelson,* 711 F.2d 1455, 1465 (11th Cir.1983), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Congress and the Executive branch share the immigration power. *See* id.

"It may be exercised by the Executive and the Senate through the execution of treaties, (citation omitted), through the legislative powers of Congress, (citation omitted), and in part by the Executive branch acting alone, as a function of its plenary authority over foreign relations." *See* id.; *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317.

The decision how to interpret the Immigration and Nationality Act is for other branches of government, and judicial deference to the Executive Branch is especially appropriate in immigration matters. *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). In administrative review, the court may not reverse a decision because another result is also reasonable or even if the court itself would decide the issue differently. *See Department of HHS v. Chater,* 163 F.3d 1129, 1134 (9th Cir.1998). The AAO's findings of fact are reviewed for substantial evidence. *See* 5 U.S.C. § 706(2)(E). A reviewing court should not overturn an agency's findings simply because alternative findings could be sup-

ported by substantial evidence from the same record. *See Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).

Because the INS denied Chang's petition on multiple alternative grounds, plaintiff can succeed on her challenge only if she shows that the INS abused it discretion with respect to all of the INS's enumerated grounds. *See RLILP,* 86 F.Supp.2d at 1021. The INS must show that it had at least one valid ground for denial. *See* id.

Defendants contend that the AAO did not abuse its discretion because its decision was reasonable, supported by substantial evidence, and complied with due process. Plaintiff rejoins that the findings of the AAO were arbitrary and capricious on three grounds for which the visa petition was denied:

1) that plaintiff established the requisite employment creation;

2) that plaintiff adequately documented the source of her funds;

3) that plaintiff adequately demonstrated a proper investment of capital and that the investment was at risk.

*See* Pl. Br. at P. 28, 36, 38.

3. *DISCREPANCIES*

a. *BUSINESS PLAN*

 8 C.F.R. § 204.6(e), defines a commercial enterprise as "any for-profit activity formed for the ongoing conduct of lawful business." The AAO found Chang's business plan to lack credibility for many reasons. The government was accommodating in allowing Chang three opportunities to correct the deficiencies in her petition. On December 22, 1997, Chang incorporated FMA Enterprises. *See* A.R. 469. According to Chang's business plan submitted with her EB–5 application, FMA would participate in an investment program developed by Spencer Enterprises, a Fresno real estate develop-

er and contractor. *See* A.R. 477–479. In early 1994 Spencer learned of the EB–5 provisions of the INA and set out to implement an investment program. *See* A.R. 105.

The business plan stated that FMA had deposited $500,000 into an escrow account with Central Title Company in Fresno. *See* id. Upon approval of the EB–5 application, $421,000 would be used to purchase seven residential lots from Spencer, while the remaining funds would be used for the construction of single-family homes on the lots. *See* id. The accompanying build out/employment plan and March 23, 1998, revised exhibit to escrow instructions described eight lots, lot 55 in the Colony Subdivision and lots 2, 23, 32, 49, 50, 11, and 14. *See* A.R. 467, 477–479.

On October 15, 1998, the INS sent a detailed request for additional information. *See* A.R. 552. Chang was asked to explain the discrepancy between the seven lots identified in the business plan and eight lots listed in the build out/employment plan. *See* id. Chang's response submitted an additional business plan claiming the reference to the seven lots was an error. *See* A.R. 295. The new build out/employment plan and the new exhibit to escrow instructions listed lot 55 in the Colony Subdivision; lots 2, 31, 32, 48, 49, and 50 in the Excalibur Subdivision; and lot, 22 in the Carriage Oaks subdivision. *See* A.R. 307. Three of these lots were different from those identified in the previous plan.

Lot 22 had been previously purchased by Blue Crystal Co., Inc., another developer, in January 1997. *See* A.R. 12. On certification, Chang furnished a third business plan again listing Lot 22. *See* A.R. 178–196. Counsel for Chang submits that the inconsistencies were due to an "obvious typographical error." *See* Pl. Mot. for S.J. at P.27. However, the AAO noted that it is not clear why Chang listed Lot 22 in re-

sponse to the INS' October 1998 letter and again on her certification. *See* A.R. 12. From these three errors, the AAO concluded Chang's petition lacked credibility. *See Matter of Ho,* 19 I & N Dec. 582 (BIA 1988) (Doubt cast on any aspect of a petitioner's proof inherently raises questions as to the credibility of the remaining evidence of record, and any attempts to explain or reconcile such inconsistencies absent competent objective evidence pointing to where the truth lies, will not suffice).

The AAO refers to the August 11, sales and construction management agreement between FMA and Spencer. *See* A.R. 10–11, 309. The document states that the agreement had been executed on August 11 of no particular year. *See* id. The bottom of the first page states the document was revised on January 4, 1999. *See* id. The bottom of the other pages state that those pages were revised on May 2, 1997.[4] Petitioner does not indicate whether the pages were attached from a prior document. The discrepancy raises questions regarding the identity and true content of the agreement that the petitioner executed. The AAO did not abuse its discretion in finding that based on the various discrepancies and inconsistencies, these documents lacked credibility. *See* A.R. 10–11.[5]

## 4. *EMPLOYMENT CREATION*

As to Chang's first business plan, the AAO found *inter alia,* that Chang failed to establish that her business plan would create 10 or more continuous, full-time employment positions as required by INA section 203(b)(5)(a)(ii), 8 C.F.R. §§ 204.6(e)

and 204.6(j)(4)(i). 8 C.F.R. 204.6(j)(4)(i) states, in pertinent part:

> To show that a new commercial enterprise will create not fewer than ten (10) full-time positions for qualifying employees, the petition must be accompanied by:
>
> (A) Documentation consisting of photocopies of relevant tax records, Form I–9, or other similar documents for ten (10) qualifying employees, if such employees have already been hired following the establishment of the new commercial enterprise; or
>
> (B) A copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired.

Chang was under an obligation to produce a credible business plan. *See In re Ho,* Int. Dec. No. 3362, 1998 WL 483979 (1998). The AAO expressed significant doubt that FMA would employ at least 10 full-time construction workers. Full-time employment means "employment of a qualifying employee by the new commercial enterprise in a position that requires a minimum of 35 working hours per week." *See* 8 C.F.R. § 204.6(e). Chang submitted on at least two prior occasions detailed business plans and build out/employment plans. *See* A.R. 188, 307. Chang also submitted a detailed and complex analysis of Chang's business plan from Dr. Joseph Penbera, an economist and business consultant. *See* A.R. 69–77. Chang failed

---

**4.** A new version of the Chang/Spencer sales and construction management agreement was submitted for the first time on appeal. It contained substantive changes and could not be accepted for the first time on appellate review. A.R. 10.

**5.** The third sales and construction management agreement was similarly confusing in that it stated that it was executed on March 15, 1999, but revised on May 2, 1997. *See* A.R. 91.

however, as the AAO pointed out, to show that individual workers may work 35 hours or more during a given week. *See* A.R. 13.

 The AAO did not abuse its discretion in construing full-time employment to mean continuous, permanent employment. *See* id. The Ninth Circuit has held an abuse of discretion when the Board of Immigration Appeals ("BIA") required an additional statutory requirement. *See Ruangswang v. INS*, 591 F.2d 39, 43 (9th Cir.1978). In *Ruangswang*, the petitioner, a native and citizen of Thailand, claimed to be exempt from a labor certificate requirement because she was an "investor" under 8 C.F.R. § 212.8(b)(4) (1974). *See* id. at 41. Although the petitioner met the minimum investor requirement of $10,000, by investing $13,300, the INS took the position that merely meeting the objective criteria in the statute was insufficient to qualify for investor status. The investment was required to be substantial. *See* id. at 43.

 Here, the AAO's conclusion did not add an additional factor to 8 C.F.R. § 204.6(e), but merely clarified its decision. Even *assuming arguendo*, that the AAO abused its discretion by adding an additional factor, Chang's build out/employment plans show that employment of 10 qualifying full-time employees is speculative. *See* A.R. 307; 8 C.F.R. § 204.6(j)(4)(i)(B). Although individual workers may work 35 hours or more during a given week, their employment as construction workers will be intermittent.

The business plan states generally that FMA will employ workers in the concrete, framing, finish carpentry, masonry, and roofing trades. *See* id. Spencer stated to the INS that it would employ construction workers only when their skills were needed as each residence is built. *See* A.R. 13. The AAO determined that all three build out/employment plans reveal that numbers of each category of employee will fluctuate

up and down by month. *See* id. For example, the most recent plan projects three framing employees during June of 1999, and zero in August of 1999. *See* A.R. 307. From August 1999 through February 2000, there are not even ten qualifying employees. *See* id. The described jobs to be created by FMA do not appear to qualify as permanent, full-time positions, but rather, arise when building trade skills are needed during a phase of construction.

## 5. *SOURCE OF FUNDS*

 Chang contends that she submitted substantial documentation establishing that the funds she invested in FMA were lawfully acquired. Pl. Br. at 18:6–7. As evidence, she cites A.R. 282–83, 443–46. At A.R. 282–83 and 443–46, Chang references several exhibits regarding her finances. She does not point to where in the record this information exists. Chang must present clear documentary evidence of the source of the funds she invests, and that the funds are her own. *See In re Soffici*, Int. Dec. No. 3359, 1998 WL 471519 (1998); *In re Ho*, Int. Dec. No. 3362, 1998 WL 483979 (1998).

Chang states that the $500,000 was transferred to an escrow account as follows: $10,000 on August 21, 1997, from the Singapore Branch of Royal Bank of Canada; $100,000 on November 25, 1997, from Royal Bank of Canada; and $390,000 on November 28, 1997, from Taiwan Business Bank. *See* A.R. 443–446. To document the path of the first transfer of funds, petitioner submitted a wire-transfer record dated August 21, 1997, from Royal Bank of Canada. *See* A.R. 496. This document stated that "one of our clients" ordered the transfer of $10,000 out of account # 001–1–940202, described as a "COMMERCIAL AC." *See* id. The beneficiary was named as Central Title, with account # 248019028 at WestAmerica Bank in Fresno. *See* id.

According to the corresponding incoming message print, the amount of $9,983 (less finance charges) was deposited into Central Title's account. *See* A.R. 495. Chang was not named as the holder of commercial account # 001–1–940202. *See* id.

In Chang's "financial declaration," she stated that the $10,000 was withdrawn instead from account # 7005606, yet the records do not corroborate this claim. *See* A.R. 496, 508. Although Chang submitted a certificate of deposit dated July 21, 1997, from account # 7005606, in the amount of $110,302.46, *see* A.R. 497, nothing in the record links these funds to the $10,000 apparently withdrawn from account # 001–1–940202. *See* A.R. 17.

To document the path of the second wire transfer of funds, Chang submitted a wire-transfer record dated November 25, 1997, from the Royal Bank of Canada. *See* A.R. 493. Chang was identified as ordering the transfer of $100,000 from commercial account # 001–1–940202 to Central Title's account # 248019028 at WestAmerica Bank. *See* id. According to the corresponding incoming transfer receipt, the amount of $99,983 was deposited in Central Title's account. *See* A.R. 492. The AAO noted that Chang's financial declaration stated that the $100,000 and $10,000 deposits came from account # 7005606. *See* A.R. 16–17, 508. The documents do not corroborate this claim.[6]

To document the path of the third wire transfer of funds, Chang's financial declaration states that the $390,000 originated from "USD10,000 by TWO exchange to USED, USD40,000 by FX A/C, USD340,000 by TX Time Deposit and all withdrew from A/C of Chang Li Hui." *See* A.R. 508. Plaintiff also submitted two documents showing that Chang instructed Taiwan Business Bank to transfer $390,000 to account # 248019028 at WestAmerica Bank and that $389,985 was deposited into the beneficiary account. *See* A.R. 490–491. These documents do not show from what account number the funds were withdrawn to conclusively prove they are from Chang. Chang does not assert she used property or stock ownership to actively invest the required amount of capital in the commercial enterprise. *See* 8 C.F.R. § 204.6(j)(2).

The AAO further found that Chang failed to designate the nature of her employment for three of her four jobs and did not submit tax information for five years as the regulations require. *See* A.R. 20. These are hypertechnical requirements to serve a valid government interest; i.e., to confirm that the funds utilized in the program are not of suspect origin.

## 6. *INVESTMENT OF CAPITAL*

■ Under the Immigrant Investor Program, absent prescribed statutory circumstances, the minimum dollar amount a petitioner must invest is $1,000,000. *See* 8 U.S.C. § 1153(b)(5)(C)(i). The Attorney General, however, has the discretion to lower the amount required for targeted employment areas:

> The Attorney General may, in the case of investment made in a targeted employment area, specify an amount of capital required under subparagraph (A) that is less than (but not less than 1/2 of) the amount specified in clause (i).

*See* id. at § 1153(b)(5)(C)(ii). Targeted employment area means an area which, at the time of investment, is a rural area or an area which has experienced unemploy-

---

**6.** Chang submitted documents showing that she had two certificate of deposits with the Royal Bank of Canada, contract # 1010933–010 containing $110,302.46 as of July 21, 1998, and contract # 113749–2, containing 101,633.44. *See* A.R. 494, 497. The record does not link these funds to the $10,000 and $100,000 apparently withdrawn from account # 001–1–940202.

ment of at least 150 percent of the national average rate. *See* 8 C.F.R. § 204.6(e).

On January 27, 1999, the INS California Service Center determined that Fresno County, California, is a targeted employment area, qualifying the petitioner to make a reduced capital investment of $500,000. *See* A.R. 269. On April 26, 1999, however, the Office of Administrative Appeals reversed this holding. *See* A.R. 22. It found that the official materials submitted by Chang only showed that Fresno County qualified as a targeted employment area in 1995. *See* id.; *In re Soffici,* Int. Dec. No. 3359, 1998 WL 471519 (1998) (petitioner has the burden to establish that enterprise will do business in a targeted area as of the date she files her petition). Plaintiff contends that she did submit 1998 data and references A.R. 125, 175–76. *See* Pl. Facts ¶ 50. These pages are part of a report produced by the Fresno State Sid Craig School of Business and are not from an authorized body of the government of California ·pursuant to 8 C.F.R. § 204.6(j)(6)(ii)(B). At A.R. 125 and 176, there is a chart that says the average unemployment rate in Fresno County for 1998 was 13.9 percent. *See* A.R. 125, 176. Although plaintiff characterizes the AAO's finding as inexplicable, the AAO provides an explanation:

> The record does contain a housing report, which cites various unemployment figures, prepared by three individuals at the Sid Craig School of Business. The report does not cite the corresponding national rates of unemployment, and the Sid Craig School of Business is not an official California State Agency.

*See* A.R. 22 n. 11. Plaintiff cites Fact 50 again to support her allegation that Fresno County's unemployment was more than three times the national unemployment rate. *See* Br. at 21:1–2. None of the citations to the record made by Fact 50 provide this information. The AAO is correct that neither the report nor plaintiff

provides the corresponding national rates of unemployment pursuant to 8 C.F.R. § 204.6(j)(6)(ii)(A).

Plaintiff cites to information provided by the Governor's office and a letter from the Mayor, a member of the Fresno County Board of Supervisors. As to the information from the Governor's office, it only provides irrelevant 1995 data. *See* A.R. 499. The AAO addressed this directly: under *Soffici,* a petitioner must submit data for the year in which the petition is submitted. The Governor's office information does not conform to this standard. The letter from the Fresno County Board of Supervisors must meet the requirements of 8 C.F.R. § 204.6(i). Section 204.6(i) provides:

> The state government of any state of the United States may designate a particular geographic or political subdivision located within a metropolitan statistical area or within a city or town having a population of 20,000 or more within such state as an area of high unemployment (at least 150 percent of the national average rate). Evidence of such designation, including a description of the boundaries of the geographic or political subdivision and the method or methods by which the unemployment statistics were obtained, may be provided to a prospective alien entrepreneur for submission with Form I–526. Before any such designation is made, an official of the state must notify the Associate Commissioner for Examinations of the agency, board, or other appropriate governmental body of the state which shall be delegated the authority to certify that the geographic or political subdivision is a high unemployment area.

*See* id. Nothing in the record indicates that the Fresno County Board of Supervisors is considered a body of state government. Nor is there any indication that an

official of the state notified the Associate Commissioner for Examinations of the County Board of Supervisors that it would be delegated the authority to certify that the geographic or political subdivision is a high unemployment area. *See* id. Although hypertechnical, the INS has insisted on strict compliance with its rules and plaintiff should have expected to meet these requirements.

■ A petitioner must also demonstrate that the requisite amount of invested capital is at risk. Such evidence includes, but is not limited to:

(i) Bank statement(s) showing amount(s) deposited in United States business account(s) for the enterprise;

(ii) Evidence of assets which have been purchased for use in the United States enterprise, including invoices, sales receipts, and purchase contracts containing sufficient information to identify such assets, their purchase costs, date of purchase, and purchasing entity;

(iii) Evidence of property transferred from abroad for use in the United States enterprise, including United States Customs Service commercial entry documents, bills of lading, and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

(iv) Evidence of monies transferred or committed to be transferred to the new commercial enterprise in exchange for shares of stock (voting or nonvoting, common or preferred). Such stock may not include terms requiring the new commercial enterprise to redeem it at the holder's request; or

(i) Evidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable.

*See* 8 C.F.R. § 204.6(j)(2).

Plaintiff maintains she actually invested $500,000. As evidence, she cites A.R. 488, an April 20, 1999, letter from Larry Meridian, President of Central Title. In pertinent part, the letter states that WestAmerica Bank received $500,051.00 from *and on behalf of* a Land Development Strategies, Inc. client known as FMA enterprises. *See* id. (emphasis added). Mr. Meridian's letter explains that deposit sums are not segregated by client. *See* id. It is plaintiff's burden to show that her funds are in the "business."

■ Even if Plaintiff transferred the requisite amount of money, she must establish that she placed her own capital at risk. Bank statements or other financial documents do not meet this requirement if the documents show someone else as the legal owner of the capital. *See In re Ho,* Int. Dec. No. 3362, 1998 WL 483979 (1998). Chang's supporting documentation does not satisfy the standard of *In re Ho.* Chang contends FMA is in the process of purchasing eight lots for $421,000. *See* A.R. 189. Because one lot has already been sold to another company, FMA's sales prices of the seven remaining lots will total only $363,000. *See* A.R. 24. Although her intent might have been otherwise, evidence supports the AAO's finding. *See* A.R. 25 (seven not eight lots were accurately identified for purchase). On these facts Chang does not establish she placed the required amount of her own capital at risk. The AAO's decision is not arbitrary and capricious.

## C. SPENCER DUE PROCESS CLAIMS

Spencer Enterprises claims its rights and property interests in its "contracts with investors" have been denied, both as to procedural and substantive rights. Plaintiff Chang also contends that the denial of her EB–5 application denied her procedural due process.

### 1. PROCEDURAL DUE PROCESS

▆▆▆ Spencer Enterprises had no matter pending before the INS and has no standing to raise a procedural due process claim. Chang's EB–5 application was denied on the same grounds as the service center's decision. *See* A.R. 6–27 and A.R. 268–274. Even if the denial were on new and different grounds, because Chang has never entered the United States, she had no right to procedural due process. *See Landon v. Plasencia,* 459 U.S. 21, 33, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). It is "not settled" that excludable aliens have any constitutional rights. *See Ma v. Reno,* 208 F.3d 815, 825 (9th Cir.2000), *cert. granted,* 531 U.S. 924, 121 S.Ct. 297, 148 L.Ed.2d 239 (U.S. Oct. 10, 2000) (No. 00–38) (quoting *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1449 (9th Cir.1995) (en banc)); *cf. Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) ("[O]ur immigration laws have long made a. distinction between those aliens who have come to our shores seeking admission, ... and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry' ").

Assuming, *arguendo,* entitlement to procedural due process and denial by the AAO of Chang's EB–5 application on new and different grounds, she provides no legal authority that an EB–5 application that fails to comply with the specific technical requirements of the law cannot be denied, because the service center did not identify all grounds for denial.

### 2. SUBSTANTIVE DUE PROCESS

▆▆▆ When engaging in a substantive due process analysis, a court must begin with "a careful description of the asserted right." *See Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). The corporation Spencer Enterprises has no constitutionally protected "property interest" to have an alien admitted into the United States for business purposes. Congress' broad power over immigration and naturalization authorize promulgation of rules for aliens that are "unacceptable if applied to citizens." *See Fiallo v. Bell,* 430 U.S. at 792, 794, 97 S.Ct. 1473 (1977). "The power to expel or exclude aliens is largely immune from judicial control." *See Shaughnessy,* 345 U.S. at 210, 73 S.Ct. 625. While the Immigrant Investor Program creates an opportunity for eligible aliens to enter the United States and invest in the United States economy, it does not create rights in United States' businesses to require admission of non-qualifying aliens. No United States business has a vested property right in the investor alien program.

## D. THE INS DID NOT VIOLATE THE APA

▆▆▆ Plaintiffs contend in their second, fourth, fifth, and sixth claims that issuance of the precedent decisions violated the APA's rulemaking requirements. Plaintiffs contend that the precedent decisions represent a departure from the previous legal interpretation of the EB–5 statute and their holdings impose new requirements that were subject to the APA's notice and comment rulemaking provisions. *See* Complaint at ¶¶ 22–25, 27, 32, 38, 40, 49–53, 61–70, 71–77, 78–85.

Section 553 of the APA requires agencies to submit all proposed "legislative rules" to a notice and comment period. *See* 5 U.S.C. § 553(b). Agencies however, need not follow such a course before adopting "interpretive rules." *See id.* at § 553(b)(3)(A). Interpretive rules are those "which merely clarify or explain existing law or regulations." *See Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983); *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (administrative agencies have discretion to adopt new standards through adjudications rather than rulemaking). The only agency rules governing the EB–5 statute, published by the INS prior to the precedent decisions, were the regulations themselves. Earlier decisions were all unpublished and carried no precedential weight. Only when the agency specifically designates a decision as precedent can it guide future agency decisions. *See* 8 C.F.R. § 103.3(c) (1999). Neither the INS precedent decisions nor the denial of Chang's petition effected a change in existing law. *See RLILP*, 86 F.Supp.2d at 1024 (holding that INS precedent decisions do not violate the APA). Regulations for the EB–5 program were published in 1991, codified at 8 C.F.R. § 204.6 (1999). Where Congress does not provide written definitions, an administrative agency may promulgate regulations, may formulate policy, and make rules to fill any gaps left, implicitly or explicitly by Congress. *See Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

Plaintiffs contention deals primarily with how the INS interpreted its EB–5 regulations prior to the precedent decisions. Before the INS administrative hold on EB–5 applications and issuance of the precedent decisions, seventeen participants in the Spencer investment program were approved. *See* Complaint at ¶ 23. At that time, the law that was in existence was the EB–5 statute and the Title 8, § 204.6 regulations. Chang's petition was thereafter denied. The prior approvals were granted under the INS' former interpretation of the statute. *See Chief Probation Officers of Cal. v. Shalala*, 118 F.3d 1327, 1334 (9th Cir.1997). In *Shalala*, the Department of Health and Human Services ("HHS") issued a rule terminating federal matching funds for state juvenile justice programs. *See id.* The claimants argued that by issuing the rule, "HHS contradicted what in effect had become a regulation by the Agency's past practice of approving plans allowing reimbursement for juvenile justice funds." *See id.* The Ninth Circuit held that the directive was an "interpretive" rule exempt from the notice and comment mandate of the APA. *See id.* The INS was free to change its interpretation of the regulations and issue the precedent decisions. *See RLILP*, 86 F.Supp.2d at 1024.

Here, the INS perceived abuses in the EB–5 program and caused precedent decisions to issue, to provide additional guidance to prospective participants to avoid the unintended consequence of non-qualified applicants "buying" their way into the United States. The precedent decisions do not conflict with any prior published INS decision. They do not constitute APA rule-making. Rather, the decisions provide interpretive guidance for the EB–5 program.

## E. *ESTOPPEL*

Plaintiffs contend that they detrimentally relied on previous legal interpretation expressed in "consistent and long-standing INS rules, regulations practices, interpretation, case decisions and pronouncements." *See* Complaint at ¶¶ 22–25, 27, 32, 38, 40, 49–53, 61–70, 71–77, 78–85. "[I]t is well settled that the Government may not be estopped on the

same terms as any other litigant." *See Heckler v. Community Health Servs.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). A party seeking to estop the government must show that the government engaged in some form of affirmative misconduct beyond negligence, *see OPM v. Richmond*, 496 U.S. 414, 421, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) [7], which requires "an affirmative misrepresentation or affirmative concealment by the government." *See Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir.1989) (per curiam), *cert. denied*, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990).

█ There is no basis for a claim of estoppel. There is no showing that the INS acted wilfully or recklessly to deprive plaintiffs of any rights. The precedent decisions were the first published and binding expressions by the INS with regard to its interpretation of the EB-5 law and interpretive regulations. This interpretative authority is an agency function committed to the INS by law. *See* 8 C.F.R. § 103.3(c). Any administrative agency has authority and discretion to adopt new standards through adjudication rather than rule-making. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). All previous decisions by the INS had been unpublished and had no precedential authority. *See Leal–Rodriguez v. INS*, 990 F.2d 939, 946 (7th Cir.1993) (unpublished Board of Immigration Appeals decisions "are treated as limited to their facts" and "do not serve as authority for later proceedings involving the same issues, nor do they make new law"); *see also Crude Co. v. F.E.R.C.*, 135 F.3d 1445, 1452 (Fed.Cir. 1998).

There were no interpretive guidelines published in the Federal Register. *See Pfaff v. HUD*, 88 F.3d 739, 748 (9th Cir.

1996). No officially published opinions of the INS General Counsel had been issued. *See Han v. DOJ*, 45 F.3d 333, 339 (9th Cir.1995). There was therefore no prior decision, no prior rule, no prior statute, no interpretive guideline, or officially published opinion on which any party could rely in good faith. Plaintiffs had no legally vested right in or justification for relying on the prior unpublished decisions to give rise to estoppel.

█ Even upon a finding of affirmative misconduct, "the government cannot be estopped unless its acts also threaten to work serious injustice and the public's interest will not be unduly damaged by the imposition of estoppel." *See Watkins*, 875 F.2d at 707. No evidence has been submitted that any representation was made to Spencer to induce any reliance. *See Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir.1986). There is no serious injustice here because Chang's money was placed in an escrow account to be released only on condition that her visa petition was approved and or Spencer would reimburse FMA for any advances made prior to closing escrow. *See* A.R. 9–10. The parties recognized and made their bargain contingent upon the requirement for prior INS approval under the Immigrant Investor Act.

## V. CONCLUSION

In no area of the law is judicial authority more restrained than immigration matters. The court lacks authority to substitute judicial judgment for that of the Executive. The INS regulations and precedent decisions limit the court's ability to grant the relief sought. For all the reasons stated above, plaintiff Chang's motion for summary judgment is DENIED. Defendants'

---

7. The opinion noted that the Supreme Court has "reversed every finding of estoppel that

[it] has reviewed." *See OPM v. Richmond*, 496 U.S. at 421, 110 S.Ct. 2465.

cross-motion for summary judgment on all claims is GRANTED.

The claims of plaintiffs Sun and Raan are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction, if they can allege exhaustion, they shall amend their complaint within 20 days following date of service of this decision.

Plaintiff, Ping–Fu Lu is DISMISSED WITHOUT PREJUDICE for failure to state a claim.

SO ORDERED.